[Cite as *State v. Trotter*, 2012-Ohio-2760.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 97064

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DAVID C. TROTTER

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-525504

BEFORE:    Sweeney, J., Celebrezze, P.J., and Keough, J.

RELEASED AND JOURNALIZED:    June 21, 2012

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik, Esq.
Cuyahoga County Public Defender
By: Nathaniel McDonald, Esq.
Assistant Public Defender
310 Lakeside Avenue, Suite 400
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Scott Zarzycki, Esq.
Assistant County Prosecutor
Eighth Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

**{¶1}** Defendant-appellant David Trotter ("defendant") appeals his rape and kidnapping convictions and associated 60-year prison sentence. After reviewing the facts of the case and pertinent law, we affirm in part, reverse in part, and remand for merger of allied offenses and a new sentencing hearing.

**{¶2}** On March 26, 2009, 14-year-old B.B. went to a party with three high-school-aged boys she knew. The party was at defendant's house, and he supplied the teens with alcohol. B.B. and her friends knew about the party because they went to school with two of defendant's sons. At some point in the night, B.B. became drunk and threw up. Defendant cleaned her up and put her in a bedroom downstairs. When he checked on B.B. after awhile, he saw that she had thrown up again. Defendant cleaned her up again and put her in an upstairs bedroom.

**{¶3}** B.B. allegedly woke up to defendant performing oral sex on her. He then began having vaginal intercourse with her, and she told him to stop. Defendant left the bedroom after a minute or two, and one of B.B.'s friends drove her home later that morning.

**{¶4}** Defendant was charged with four counts of rape and two counts of kidnapping related to this incident. Defendant was also charged with 11 counts related to child pornography found on his home computer. In January 2010, a bench trial began, however, after six days of testimony, the court granted a sua sponte motion to suppress the

evidence found on defendant's computer. The state appealed this ruling, and this court reversed. *State v. Trotter*, 8th Dist. No. 94648, 2011-Ohio-418.

**{¶5}** In February 2011, trial resumed, and on March 22, 2011, the court found defendant guilty of two counts of forcible rape in violation of R.C. 2907.02(A)(2); two counts of substantial impairment rape in violation of R.C. 2907.02(A)(1)(c); and two counts of kidnapping in violation of R.C. 2905.01(A)(4). The court acquitted defendant of all counts relating to the child pornography.

**{¶6}** The court sentenced defendant to ten years in prison on each of the six counts and ran them consecutively, for an aggregate prison sentence of 60 years.

**{¶7}** Defendant appeals and raises four assignments of error for our review.

**{¶8}** I. "Mr. Trotter's convictions are against the manifest weight of the evidence, in violation of his right to due process of law under the 14th Amendment to the Constitution of the United States and Article I, Section 14, of the Ohio Constitution."

**{¶9}** Specifically, defendant argues that the timeframe of events to which B.B. testified cannot be accurate given the other witnesses's testimony.

**{¶10}** To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶11}   Defendant was convicted of two counts of forcible rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force"; two counts of substantially impaired rape in violation of R.C. 2907.02(A)(1)(c), which states that "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe [this]"; and two counts of kidnapping in violation of R.C. 2905.01(A)(4), which states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will * * *."

{¶12}   Our review of the record shows that the following testimony was presented at trial:

{¶13}   B.B. testified that on March 26, 2009, she went to a party at defendant's house with M.K., C.M., and W.G.   B.B. did not know defendant, but she was in the eighth grade with his son J.T.   When B.B. and her friends arrived at defendant's, J.T. was not home, however, defendant and defendant's friend were there.   Defendant and M.K. went to buy alcohol and came back with vodka and orange juice.   B.B. drank two to three screwdrivers between approximately 9:00 and 11:00 p.m.   B.B. remembered feeling sick and eating barbecue chicken and sherbert ice cream, thinking "food would make it feel better."   However, this did not work, and B.B. recalled vomiting on herself and C.M. on

the couch in the living room.   She remembered defendant and C.M. taking her to the bathroom to get cleaned up because she "barely could stand."   The next thing B.B. recalled after the bathroom was waking up in the upstairs bedroom.

> [Defendant] was laying on my knees.   I only had a T-shirt on, nothing else.   My pants were at the end of the bed.   So was my phone.   Um — um, he began to, um, have oral sex with me. * * * I kept saying, no, and stop. * * * It didn't really have a big effect, but he stopped maybe 20, 30 seconds after he started. * * * I didn't feel good at all.   I felt vulnerable, like I couldn't move.   And like, I felt like my body just had stopped, like I couldn't get up or anything.   Like [the] only thing I could do was speak.

{¶14}   Asked what happened after defendant stopped performing oral sex on her, B.B. testified that "he got on top of me, and started having sex with me," explaining that defendant put his penis inside her vaginal area.   Defendant was on top of B.B., and she was "[s]creaming, and sort of struggling.   And like, I said — like I said before, I couldn't move."   B.B. testified that she recalled "[t]elling him to stop, and get off me.   And, like, I barely could scream.   Like it felt like I couldn't scream.   But I was trying my hardest."   After "a minute or so," defendant got off of B.B., put his pants back on, left the room, and got on the computer in the hall.

{¶15}   B.B. put her clothes on and went downstairs.   M.K. was asleep on the couch and C.M. was on the floor watching television.   Later that morning, M.K. took her home.   Later that day, she sent text messages to M.K.   and C.M. telling them what defendant allegedly did to her.   The following Monday, B.B. told her mother what happened.   B.B. testified that she waited until Monday because she was scared.   B.B.'s

mom called the police, who began an investigation, and B.B. was taken to the hospital for a rape kit.

{¶16} M.K. testified that he, B.B., C.M., and W.G. went to a party at defendant's house on March 26, 2009. When they arrived, M.K. asked defendant to buy them alcohol. M.K. took defendant to the liquor store, and defendant purchased a case of beer and vodka. Back at defendant's house, everyone, including B.B., began drinking. B.B. started "stumbling around, and she started not to feel good."

{¶17} Sometime between 11:00 p.m. and midnight, M.K. offered B.B. a ride home, but she refused because she did not want to get in trouble for drinking. M.K. witnessed defendant offer to call B.B.'s mom and tell her that B.B. was spending the night at a friend's. Defendant made this phone call from B.B.'s cell phone.

{¶18} M.K. took W.G. and another boy home, then returned to the party. When M.K. got back to defendant's house, B.B. was passed out in an upstairs bedroom. Defendant and C.M. were downstairs listening to music and smoking marijuana. Around 2:00 a.m., Sean Wood came to defendant's house with more marijuana.

{¶19} M.K. testified that approximately one hour later, defendant said, "[W]e can go upstairs, and we can do whatever we want to [B.B.] because she's passed out, and she wouldn't realize anything." After awhile, defendant turned up the music, and he and Wood went upstairs. M.K. and C.M. got suspicious and "went to see what was going on up there." They saw defendant on the computer in the hall with Wood standing next to him. B.B. was asleep in one of the bedrooms. M.K. and C.M. came back downstairs.

After 15 to 20 minutes, Wood came downstairs, and five minutes later, defendant came back downstairs. M.K. did not see B.B. again until she came downstairs the next morning, and he drove her home. He received a text message from B.B. later that day describing what defendant did to her.

{¶20} R.F. testified that he is a senior in high school and in the same class as defendant's son. R.F. was at the party at defendant's house on March 26, 2009. R.F. left the party around 11:00 p.m., and at that time, B.B. was intoxicated. R.F. went back to defendant's late the next morning, and defendant told R.F. that B.B. was drunk the night before and had stayed over. Defendant also made a comment about B.B.'s breasts. Defendant told R.F. that B.B. got sick, so he had to undress her and put her in the upstairs bedroom.

{¶21} C.M. testified that he, M.K., W.G., and B.B. went to a party at defendant's house on March 26, 2009. When they arrived, M.K. took defendant to buy alcohol. After they began drinking, C.M. overheard defendant talking to B.B.'s mom on the phone and telling her that B.B. would be spending the night at a friend's house. B.B. was drinking vodka and orange juice, and beer, and at one point, B.B. threw up when she was sitting next to him on the couch. C.M. and defendant took B.B. to the bathroom to clean her off and change her shirt, then put her into a bedroom. They went to check on her after about an hour, and she had thrown up in the bed. Defendant cleaned and changed her again, and put her into another bedroom upstairs.

{¶22} Sometime around 2:00 a.m., Wood arrived and Wood, defendant, and C.M. smoked marijuana. Defendant said to Wood, "there is a drunken 14 year old upstairs." Approximately one hour later, defendant turned the music up and went upstairs. C.M. was curious about what was going on, went upstairs, and saw defendant on his computer. Defendant came downstairs about ten minutes later. Defendant said that B.B. tried to unzip his zipper, and she pulled out his penis and gave him oral sex.

{¶23} According to C.M., B.B. came downstairs at about 5:45 a.m. and sat in a brown chair right above where C.M. was lying on the floor. Defendant left the room when B.B. entered it. B.B. whispered to C.M. that defendant had touched her. Defendant came back into the room, and C.M. told B.B. they would talk about it later. C.M. saw vomit in B.B.'s hair and told her to shower. She did, and he took her home sometime around 9:30 a.m.

{¶24} Sean Wood testified that he arrived at defendant's house in the early morning hours of March 27, 2009, to smoke marijuana. Wood's recollection of events was hazy to say the least, and several attempts to refresh his memory with the statement he allegedly made to the police failed. This issue will be discussed in further detail in defendant's second assignment of error, but for now, Wood eventually testified to the following, either via his memory or via the statement he made to police.

{¶25} He learned from defendant prior to arriving that there was a drunk 14-year-old girl passed out in an upstairs bedroom. When he got to defendant's, there were two young men there that he did not know. They sat around drinking and smoking,

and eventually he and defendant went upstairs. Wood went on defendant's computer in the hallway, and defendant went in the bedroom with the girl. Defendant stayed in the bedroom for 35 to 45 minutes, and Wood heard "kissing noises" coming from the room.

{¶26} Although Wood did not recall saying this to the police, according to his statement, Wood told the police that when defendant exited the bedroom, defendant said he had sex with B.B. After defendant went downstairs, and while Wood was still on the computer, one of the young men came upstairs to check on B.B. When the blanket was lifted, Wood could see that she just had a t-shirt on and she was sleeping. Wood testified that his intention when he went upstairs with defendant was to have sex with the girl. However, at some point, he changed his mind.

{¶27} Detective David Sheridan of the Parma Police Department testified that he was assigned this case after B.B. reported being sexually assaulted by defendant at a party at his house. Det. Sheridan interviewed B.B., defendant, and others who were at the party. Det. Sheridan went to defendant's home and collected B.B.'s hoodie sweatshirt, which was still soiled with vomit from the night of the party.

{¶28} Det. Sheridan testified that defendant admitted to having the party and supplying the teens with alcohol on the night in question. Defendant's statement to the police allegedly corroborated the story about B.B. getting sick twice, being cleaned up twice, and ending up in the upstairs bedroom. According to defendant, however, when he and Woods were upstairs using the computer, it was Woods who went into the bedroom and sexually abused B.B.

**{¶29}** In the instant case, defendant's argument that his convictions are against the manifest weight of the evidence is based on his assertion that all the testimony "demonstrates that [he] was not upstairs at the time the alleged assault [B.B.] described had to occur." Our review of the record, however, shows otherwise. M.K., C.M., and Wood, who were in defendant's house when the rape was alleged to have occured, testified that defendant was upstairs when B.B. was passed out, and defendant knew that she was passed out because she drank too much. According to Wood, defendant was alone in the room with B.B. for 35 to 45 minutes, and Wood heard kissing noises coming from the room.

**{¶30}** Defendant made it known that they could do whatever they wanted to B.B. He allegedly told Wood that he had sex with her, and he told C.M. that B.B. gave him oral sex. B.B. told C.M. that defendant touched her immediately after it happened, and she texted both C.M. and M.K. with the information later that day. This testimony, coupled with B.B.'s recollection of the events, is enough to show that defendant's convictions were not against the manifest weight of the evidence, and his first assignment of error is overruled.

**{¶31}** In defendant's second assignment of error, he argues as follows:

**{¶32}** II. "The trial court erred when it admitted inadmissible hearsay evidence in violation of Rules 612 and 802 of the Ohio Rules of Evidence."

**{¶33}** Specifically, defendant argues that the rule regarding refreshing a witness's recollection using previous statements was violated during Wood's testimony.

According to defendant, the trial court permitted and/or ordered Wood to read portions of his statement to the police into the record in violation of Evid.R. 612, and this violation was prejudicial as it went "straight to the heart of the matter — whether [defendant] had sex with [B.B.]."

{¶34} Under Evid.R. 612, which is a "'present recollection refreshed' situation, the witness looks at the memorandum to refresh his memory of the events, but then proceeds to testify upon the basis of his present independent knowledge." *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972). "However, a party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury." *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996).

{¶35} Evid.R. 612 is distinguishable from Evid.R. 803(5), which is a

'past recollection recorded' situation, [in which] the witness's present testimony is to the effect that his recollection was complete at the time the memorandum was written and that such recollection was accurately recorded therein.

*Scott*, at 6. Under Evid.R. 803(5), the witness must have made or adopted the statement "when the matter was fresh in his memory," and "the past recollection recorded correctly reflects the knowledge the witness had at the time it was recorded." *State v. Bailey*, 8th Dist. No. 81498, 2003-Ohio-1834, ¶ 32. If Evid.R. 803(5) is satisfied, the statement itself may be read into evidence.

{¶36} In the instant case, Wood testified that he looked at the statement he made to the police about the night in question before he testified and while he was on the witness stand, but that it did not refresh his memory. For example, asked what defendant

said to Wood on the phone on March 26, 2009, Wood replied, "I don't remember. I read [the statement], but it doesn't look familiar." Wood also testified that he did not remember what defendant said when defendant came out of the upstairs bedroom where B.B. was. The state instructed Wood to read his statement to the police, and after doing so, Wood testified, "I don't remember him saying that to me, though."

**{¶37}** Over defense objections, Wood read portions of his statement into the record and, after prompts from the court, testified to certain things from memory. The hearsay statements that Wood improperly read into the record are as follows: First, before Wood arrived at defendant's house on the night in question, defendant allegedly told Wood on the phone that there was a drunk 14-year-old passed out at defendant's house. And second, defendant allegedly said that he had sex with B.B. when he walked out of the upstairs bedroom where B.B. was passed out.

**{¶38}** Further examination of Wood regarding his statement was improper under Evid.R. 612, because Wood testified that it did not refresh his memory. Additionally, the State did not establish that the statement accurately reflected Wood's knowledge at the time of the police interview. In this regard, Wood's testimony regarding his statement was improper under Evid.R. 803(5).

**{¶39}** The admissible portions of Wood's testimony — that which he testified to from memory — merely corroborated B.B.'s testimony. In this case, B.B.'s testimony, standing alone, is enough to convict defendant. *State v. Blankenship*, 8th Dist. No. 77900 (Dec. 13, 2001) ("[t]here is no requirement that a rape victim's testimony be corroborated

as a condition precedent to conviction"). The portions he read from his statement were inadmissible hearsay, and we must determine whether they were prejudicial or harmless. "The dispositive question is whether the hearsay testimony of these witnesses constituted harmless error." *State v. DeMarco*, 31 Ohio St.3d 191,196, 509 N.E.2d 1256 (1987).

**{¶40}** We are reminded that the case at hand was tried to the court and not a jury. "In a bench trial, there is a presumption that the court considered only relevant, material, and competent evidence." *State v. Brown*, 8th Dist. No. 87947, 2007-Ohio-287, ¶ 15. Without the hearsay evidence, defendant's convictions are supported by consistent testimony from B.B., which is corroborated by M.K., C.M., and Wood. The detective who investigated the case interviewed these parties, and their statements were consistent. Furthermore, the court found defendant not guilty of various counts unrelated to this appeal. Nothing in the record suggests that the court relied on prejudicial evidence to convict defendant of the offenses at hand, and his second assignment of error is overruled.

**{¶41}** Defendant's third assignment of error states the following:

**{¶42}** III. "The trial court violated the United States and Ohio Constitutions, as well as R.C. 2941.25(A), when it failed to merge Mr. Trotter's convictions for rape in counts one and two with this convictions for rape in counts three and four, and failed to merge his convictions for kidnapping with his convictions for rape."

**{¶43}** Specifically, defendant argues that his convictions should have merged into two counts for sentencing purposes. The state partially concedes this assignment of error,

arguing that defendant's convictions should have merged into two counts of rape and one count of kidnapping.

{¶44} The Ohio Supreme Court established the proper analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25 in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48-50.

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.
>
> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."
>
> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged. (Citation omitted.)

*Id.*

{¶45} We first analyze whether defendant's four rape convictions merge. Oral and vaginal rape are not allied offenses. *State v. Nichols*, 66 Ohio St.3d 431, 435, 613 N.E.2d 225 (1993). We now turn to whether forcible and substantially impaired rape are allied offenses. The elements of forcible rape include "when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). The elements of substantially impaired rape include when the victim's "ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe [this]."

**{¶46}** In analyzing these offenses under *Johnson*, we find that they can be committed by the same conduct. In other words, an offender could forcibly rape a substantially impaired victim. Defendant was convicted of one count of each for oral rape. We must determine whether, under the facts of this case, they were committed with a single state of mind. B.B. testified that she woke up to find defendant between her legs performing oral sex on her, and although she told him to stop, he did not do so until approximately 30 seconds later. We find this to be one single act, and the convictions should merge.

**{¶47}** Defendant was also convicted of one count of vaginal rape. Defendant got on top of B.B. and had vaginal sex with her. She told him to stop and get off of her, but she felt as if she could not move. We find this to be a second single act of rape, and the convictions should merge. *See State v. H.H.*, 10th Dist. No. 10AP-1126, 2011-Ohio-6660, ¶ 16 (defendant's "convictions for forcible rape and rape of a person whose ability to resist or consent was substantially impaired due to a mental or physical condition should have merged for sentencing").

**{¶48}** We turn to whether these two acts of rape merge with defendant's two kidnapping convictions. The state concedes that one of the kidnapping convictions merges into the rape convictions because it occurred when defendant held the victim down while he was raping her, but argues that the other kidnapping occurred when defendant took B.B. to the upstairs bedroom. However, this is not what the state argued at trial and this is not supported by the record.

{¶49} Defendant was convicted of two counts of kidnapping in violation of R.C. 2905.01(A)(4), which states that

> [n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will * * *.

{¶50} In *State v. Logan*, 60 Ohio St.2d 126, 136, 397 N.E.2d 1345 (1979), the Ohio Supreme Court held that a kidnapping was not an allied offense, because the "detention and asportation of the victim was incidental to the crime of rape * * *." In *State v. Williams*, 8th Dist. No. 94616, 2011-Ohio-925, ¶ 61, this court found that Williams's kidnapping conviction should have merged with his rape convictions because "the same conduct supports both convictions." The reasoning in *Williams* was based on the indictment, which contained a sexual motivation specification. "[T]herefore appellant's animus for the kidnaping and rape was the same or, stated differently, the rape and kidnaping were a single act, committed with a single state of mind." *Id.*

{¶51} In the instant case, according to B.B.'s testimony, defendant held her down while orally and vaginally raping her. Under the facts of this case, it is impossible to separate the restraint of her liberty from the rape as they occurred simultaneously and were committed with a single state of mind. In following *Logan* and *Williams*, we find that defendant's kidnapping convictions merge with his rape convictions, such that convictions for two offenses survive.

{¶52} Accordingly, the court erred by imposing multiple punishments for allied offenses. Pursuant to *State v. Whitfield*, 124 Ohio St.3d 319, 325, 2010-Ohio-2, 922

N.E.2d 182, ¶ 25, we "reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant."

**{¶53}** In defendant's fourth and final assignment of error, he argues as follows:

**{¶54}** IV.   "The trial court abused its discretion when it failed to weigh properly the statutory sentencing factors concerning recidivism."

**{¶55}** This assignment of error is made moot by our disposition of defendant's third assignment of error.   App.R. 12(A)(1)(c).

**{¶56}** Judgment affirmed in part, reversed in part, and remanded for a new sentencing hearing.

It is ordered that appellee and appellant split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's convictions having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


JAMES J. SWEENEY, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR